**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Case No. 15-cv-02856-RM

RICHARD WILLIAM PALMER,
DAR MAE PALMER,

      Appellants,

v.

PATRICK S. LAYING, as U.S. Trustee,

      Appellee.

---

## OPINION AND ORDER

---

On the last day of 2015, appellants Richard William Palmer ("Mr. Palmer") and Dar Mae Palmer (collectively, "appellants") appealed the decision of the U.S. Bankruptcy Court for the District of Colorado ("the Bankruptcy Court"), granting appellee the U.S. Trustee's ("the UST" or "appellee") Motion to Dismiss Debtors' Case Under 11 U.S.C. § 707(b)(1) and § 707(b)(2) or, in the Alternative, Under 11 U.S.C. § 707(b)(3) ("the motion to dismiss"). (ECF No. 1.) In their Opening Brief, appellants raised the following issue for judicial review: whether the Bankruptcy Court erred in finding that Mr. Palmer's student loan debt was a consumer debt. (ECF No. 15 at 5.)[1] Appellee has filed a Response Brief (ECF No. 17), and appellants have filed a Revised Reply Brief (ECF No. 20-1).

---

[1] The Court uses the page numbers assigned by the CM/ECF system in the top right-hand corner of the relevant pleading, rather than any other page number that may appear at the bottom of said pleading.

With this matter now being fully briefed, and for the reasons discussed herein, this Court

REVERSES the decision of the Bankruptcy Court, and DENIES the motion to dismiss.

## I.    Background

On August 27, 2014, appellants filed a voluntary petition for relief under chapter 7 of the

Bankruptcy Code.  (ECF No. 11-1 at 6-8.)  In the Schedules attached to appellants' chapter 7

petition, they listed a debt of $91,312.00 in student loans ("the student loan debt").  (*Id*. at 35.)  That

debt has become the source of the parties' conflict in this case.  This is due to the operation of

11 U.S.C. § 707(b)(1) ("707(b)(1)"), which provides that a court may dismiss a chapter 7 case if the

debts of the debtor are "primarily consumer debts" and the granting of relief to the debtor would be

an abuse of chapter 7.  11 U.S.C. § 707(b)(1).

With that provision in mind, the UST, on October 31, 2014, filed the motion to dismiss,

asserting that (1) appellants' debts were primarily consumer debts, including the student loan debt,

and (2) a presumption of abuse arose under § 707(b)(2). (ECF No. 11-1 at 82-86.)  On October 5,

2015, an evidentiary hearing was held on the motion to dismiss, at which Mr. Palmer testified.  (ECF

No. 11-2 at 3-62.)  Prior to the evidentiary hearing, the parties limited the scope of their dispute to

the singular issue of whether the student loan debt was a consumer debt under 11 U.S.C. § 101(8)

("§ 101(8)").  (ECF No. 11-1 at 115.)  The parties agreed that, if the student loan debt was a

consumer debt, then the motion to dismiss should be granted, but, if the converse was true, the

motion to dismiss should be denied.  (*Id*.)

After the evidentiary hearing, on December 15, 2015, the Bankruptcy Court entered an Order

granting the motion to dismiss.  (*Id*. at 147-158.)  Addressing the singular issue before it, the

Bankruptcy Court first explained that the Bankruptcy Code defines a consumer debt as a debt

incurred "primarily for a personal, family, or household purpose." (*Id*. at 150 (internal quotation marks omitted)).  The Bankruptcy Court then summarized and discussed the varying, and differing, approaches taken by courts in deciding whether a student loan constitutes a consumer debt for bankruptcy purposes.  (*Id*. at 151-153.)  Importantly, the Bankruptcy Court noted that the Tenth Circuit Court of Appeals has spoken, to an extent, on this issue.  Specifically, the Bankruptcy Court discussed the Tenth Circuit's decision in *Stewart v. U.S. Trustee*, 175 F.3d 796 (10th Cir. 1999) ("*Stewart III*").  In *Stewart III*, the Tenth Circuit stated that "[c]onsumer debt is further distinguished from non-consumer debt as a debt incurred with a 'profit motive.'" 175 F.3d at 806 (quotations omitted).

The Bankruptcy Court then stated that the following four concepts were important to its determination of whether a student loan is a consumer debt: (1) the Tenth Circuit's reference to "profit motive" in *Stewart III* should be interpreted narrowly because this was in keeping with the intent of the changes made to the Bankruptcy Code in 2005; (2) trying to determine whether a debt is a business or personal investment will be problematic without a narrow, objective standard; (3) without a narrow interpretation of "profit motive," it could be applied to virtually all student loans, and thus, would become an exception that swallows the rule; and (4) "[a] narrow standard, tied to an existing business, or to some requirement for advancement in a current job or organization, is necessary to avoid a student's aspirational goal, or a wished-for 'hope and dream' being the focus, as opposed to the advancement of a tangible opportunity."  (ECF No. 11-1 at 155-156.)

These four concepts led the Bankruptcy Could to conclude that, for a student loan to be incurred with a profit motive, "the debtor must demonstrate a tangible benefit to an existing business, or show some requirement for advancement or greater compensation in a current job or

organization." (*Id*. at 156.)  With that test for reference, the Bankruptcy Court found that the student

loan debt was a consumer debt because Mr. Palmer did not incur the debt "with the objective of

profiting" his employer, Essential Insurance Services ("EIS"), and EIS did not require Mr. Palmer

to pursue the education resulting in the student loan debt.  (*Id*. at 156-157.)

## II.    Legal Standards

The Bankruptcy Court's legal conclusions are reviewed *de novo*, while its findings of fact

are reviewed for clear error. *In re Stewart*, 215 B.R. 456, 459 (B.A.P. 10th Cir. 1997) ("*Stewart II*").

The determination that a debt is primarily a consumer debt is reviewed *de novo*.  *Stewart III*, 175

F.3d at 803.

The burden of proof is on the movant to support a motion to dismiss under § 707(b)(1) by

a preponderance of the evidence.  (ECF No. 11-1 at 150 (citing *In re Cherrett*, 523 B.R. 660, 668

(B.A.P. 9th Cir. 2014))).  As before the Bankruptcy Court, the only issue before this Court is whether

the student loan debt constitutes a consumer debt under the Bankruptcy Code.   Section 101(8)

defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or

household purpose." 11 U.S.C. § 101(8).  Thus, the only issue here is whether the student loan debt

was a debt incurred "primarily for a personal, family, or household purpose."  *See id*.

## III.    Discussion

Because of its importance, the Court begins with the "profit motive" test, and the Bankruptcy

Court's formulation of the same.  In *Stewart III*, the Tenth Circuit explained that consumer debt,

apart from being of a personal, family, or household nature, is further distinguished from non-

consumer debt by being incurred with a "profit motive." *Stewart III*, 175 F.3d at 806.  In applying

that concept to the student loans in *Stewart III*, though, the Tenth Circuit only definitively addressed

those loans that were used to pay for the debtor's family expenses.  The Tenth Circuit explained that

those loans (that were used for family expenses) could "fairly" be characterized as consumer debt.

*Id*. at 807.  As for the student loans used for other expenses of the debtor, the Tenth Circuit observed

that those expenses included books, tuition, and room and board.  The Tenth Circuit stated that "little

or no binding or persuasive authority exists to help us determine the characterization of educational

expenses such as books, tuition, and room and board as either consumer or business debt."  *Id*.  The

Circuit did not further address how to characterize these "educational expenses," in light of its

finding that most of the debtor's other debt was consumer.  *See id*. at 807-808.  Here, it is undisputed

that all of Mr. Palmer's student loans were used to pay for tuition and books.  (ECF No. 11-1 at 152;

ECF No. 15 at 6; ECF No. 17 at 7.)  Thus, the student loan debt here falls nicely into the void left

unresolved by *Stewart III*.

Nonetheless, in *Stewart III*, the Tenth Circuit adopted the "profit motive" test from *In re

Burns*, 894 F.2d 361 (10th Cir. 1990).  Although *Burns* involved a loan used to invest in the stock

market, *id* at 363, the discussion of profit motive helps shed some light on its application.  In *Burns*,

the Tenth Circuit explained that "a credit transaction is not a consumer debt when it is incurred with

a profit motive," citing decisions stating that a debt incurred with an "eye toward profit" or for

"profit-seeking activities" was not a consumer debt.  *Id*.  The Tenth Circuit concluded that a loan

obtained to invest in the stock market, and used to buy stock, was "clearly a transaction entered into

with a profit motive," and thus, was not a consumer debt.  *Id*.

In addition, the Tenth Circuit, in *Stewart III*, affirmed the ultimate decision of the Bankruptcy

Appellate Panel ("the BAP") in *Stewart II* to dismiss the debtor's bankruptcy petition.  *Stewart III*,

175 F.3d at 813.  *Stewart II* provides some further discussion of the interplay between student loans

and consumer debts, albeit not binding or necessarily persuasive.  Specifically, in *Stewart II*, the

BAP held that:

> student loans are not consumer debts per se.  The primary purpose for which the debt
> was incurred must be determinative.  There may be circumstances in which the
> debtor can demonstrate that the student loan was incurred purely or primarily as a
> business investment, albeit an investment in herself or himself, much like a loan
> incurred for a new business.

*Stewart II*, 215 B.R. at 465.  In applying these principles, the BAP found that the debtor's student

loans had a "dual purpose"—educational costs and living expenses.  *Id*. at 466.  The BAP also found

that the debtor was motivated to pursue an education for "humanitarian reasons," rather than "an

immediate high income."  Because of this, the BAP found that the debtor's student loans were used

"in part for family living expenses and incurred in part for personal reasons," and thus, there was no

clear error in the Bankruptcy Court finding the loans to be consumer debt.  *Id*.

   Although this Court does not completely endorse the BAP's approach to student loans and

consumer debt,[2] the Court agrees with the BAP that the primary purpose for which the debt was

incurred must be determinative.  The Court further agrees, *at least under the circumstances of this*

---

   [2] Specifically, this Court disagrees with the BAP's apparent finding that educational loans incurred
for "humanitarian reasons" are loans incurred for a personal purpose.  First, although it is unclear, it does
not appear that the Tenth Circuit endorsed this finding in *Stewart III*.  Notably, the Tenth Circuit stated that
there was nothing in the record demonstrating how much money was spent on the debtor's "tuition, books,
or other direct educational expenses *as compared* to the portion of student loans used for personal, family,
and household expenses."  *Stewart III*, 175 F.3d at 807 (emphasis added).  The Tenth Circuit then stated
that educational expenses included books, tuition, and room and board.  *Id*.  Second, the very definition of
"humanitarian" demonstrates that it has little to do with personal goals: "concerned with or seeking to
promote human welfare."  *See* New Oxford American Dictionary 848 (3d ed. 2010).  Merely because a
humanitarian purpose may not also involve a profit purpose does not mean that the debt is a consumer one.
*See In re Brashers*, 216 B.R. 59, 61 n.2 (Bankr. N.D. Okla. 1998) ("While it is true that debts incurred with
a 'profit motive' are **clearly** non-consumer, the reverse is not true.  That is, just because a debt was not
incurred with a profit motive does not mean the debt is a consumer debt.") (emphasis in original).  As noted
*supra*, a consumer debt is defined as one incurred primarily for personal, family, or household purposes.
11 U.S.C. § 101(8).  Humanitarianism does not fit, even closely, into any of those three categories.

*case*, where Mr. Palmer incurred the student loan debt while employed, that non-consumer debts include those incurred primarily as a business investment in oneself. *See id*. at 465. Applying these principles here, the Bankruptcy Court's formulation of the profit motive test simply does not comport with the decisions in *Stewart II & III*.

The Bankruptcy Court articulated the following test: "the debtor must demonstrate a tangible benefit to an existing business, or show some requirement for advancement or greater compensation in a current job or organization." (ECF No. 11-1 at 156.) The Court will address the two parts separately. As to the first, that a debtor show a tangible benefit to an existing business, this has nothing to do with *Stewart II's* statement that the debt may be incurred primarily as a business investment in *oneself*. Instead, this part of the Bankruptcy Court's test flips the inquiry and places the focus upon the benefit to (or investment in) the employer. This is not the focus of the profit motive test. *See In re Cherrett*, 523 B.R. 660, 670 (B.A.P. 9th Cir. 2014) ("the key factor in determining whether secured debt is consumer debt lies in the *debtor's* purpose in incurring the secured debt.") (emphasis in original). It would not make sense if it was, given that § 101(8) asks for what purpose the debt was incurred, and, in this situation, the debt was incurred by the debtor.

As for the second part of the Bankruptcy Court's test, that there be some requirement for advancement or greater compensation in a current job, this does have a more debtor focused inquiry, seeing as it asks whether there is a chance for the debtor to advance or obtain greater compensation. However, for no reason that can be found in *Stewart II* or *III*, the Bankruptcy Court ties the need for advancement or greater compensation to an employer requirement. The Court has multiple problems with this approach. First, *Stewart II & III* do not tie profit motive to an employer requirement; there is simply no suggestion in those decisions that a debtor's decision to pursue education must come

from an employer mandate.  Instead, the decision to pursue education, at least if the debtor wishes

to satisfy the profit motive test, must be motivated by profit.  Second, there is also no suggestion in

*Stewart II* or *III* that a debtor must have incurred student debt or pursued education while being

*currently* employed.  The obvious benefit to this rule, from a case processing standpoint, is that it

cuts out the vast majority of students from incurring a student loan that is a non-consumer debt.  The

only individuals that the rule would not appear to exclude from its reach are those employees in an

established role in their companies who seek to climb the corporate ladder under a company-

mandated policy.  Although the Court cannot say for sure, it doubts very much whether many of the

inhabitants of this nation's college campuses find themselves in that situation.[3]  For the vast majority

of college students the goal is to reach that level of establishment in a business *after graduation*; it

is not the reason they find themselves in college to begin with.

Third, the rule removes any semblance of employee initiative from the decision to seek

further education.  For example, even if an employee, like Mr. Palmer, is currently employed and

decides that it might be a good idea to add to or complement his education in a certain part of his

employer's business, if that additional education is not required by an employer, then it does not

meet the Bankruptcy Court's standard, even if the employee's sole motive for obtaining the

education was to advance in the business or achieve greater compensation.  The Court cannot

comprehend, though, a situation that more appropriately fits within *Stewart II's* statement that, for

a profit motive, a student loan should be incurred primarily as a business investment in oneself.[4]

---

[3] Certainly not those students enrolled in multi-year programs, given that it would be a rare
business decision for an employer to hire an individual only to require that person to go to college for a
significant period of time.

[4] Perhaps one example of a more appropriate fit are the facts in another case before the Bankruptcy
Court.  In *In re Kathy K. Robinson*, the Bankruptcy Court summarized the facts as follows: "The Debtor

In formulating the above rules, the Bankruptcy Court relied upon four "concepts."  This

Court finds none of them persuasive.  First, the Bankruptcy Court found that "profit motive" should

be interpreted narrowly because it is "in keeping with the intent of the changes made to the

[Bankruptcy] Code in 2005," specifically the "means test" of § 707(b)(2).  (ECF No. 11-1 at 155.)

As the Bankruptcy Court observed, the "means test" may be a way of weeding out debtors capable

of funding their reorganization, but the "means test" of § 707(b)(2) has nothing to do with whether

a debtor has "primarily consumer debts" under § 707(b)(1).  In other words, the weeding out of

undeserving debtors is done by the "means test," not in deciding whether a debtor has "primarily

consumer debts."  Moreover, as the Bankruptcy Court noted, wide-ranging changes were made to

the Bankruptcy Code in 2005, including the addition of the "means test."  One thing that did not get

changed, though, was the definition of "consumer debt" or how that term is used in § 707(b)(1).  If

Congress wanted that term to be narrowly construed for purposes of § 707(b)(1), or even for the term

to include educational debt, Congress could have easily made those changes.  In that regard, as the

UST notes in its response brief, the definition of "consumer debt" was enacted in 1978.  (ECF No. 17

---

holds a Bachelor of Science in Nursing ("BSN") degree.  She has worked diligently toward that degree goal since 2005 and obtained her BSN in 2016.  Along the way she obtained credentials and worked as a Certified Nursing Assistant ("CNA"); a Licensed Practical Nurse ("LPN"); and a Registered Nurse ("RN"). Her steadily improving educational level has led to employment where she utilized her progressively improved levels of skills and has been trusted with progressively higher levels of responsibility.  In the process of her advancement, she has earned greater financial rewards as well." 2016 WL 6269576, at *1 (Bankr. D. Colo. Oct. 26, 2016) (HRT).  Despite that seemingly glowing summary of the debtor's education and the benefits therefrom, the Bankruptcy Court found that the education merely "satisfied her personal goal of professional advancement and enhanced her personal financial prospects," and thus, her student loans fell "squarely within the definition of consumer debts under § 101(8)." *Id*. at 2.  If seeking to obtain professional advancement and enhance one's financial prospects are not business investments in oneself, the Court cannot imagine what would be.

at 23.) It is, thus, hard to say that Congress' intent in 2005 can be imputed to a term that has been

unchanged since 1978.[5]

Second, the Bankruptcy Court found that "profit motive" should be narrowly construed

because the BAP in *Stewart II* used the word "may" in describing the situations in which a debtor

could demonstrate a student loan was a non-consumer debt, and "may" is a word of limitation. (ECF

No. 11-1 at 155.) Whatever, if anything, the BAP meant in using the word "may" in *Stewart II*, and

the Court imagines it was nothing, it was certainly not the BAP's intent to produce the test

formulated by the Bankruptcy Court in this case. As discussed *supra*, the Bankruptcy Court's test

is inconsistent with both *Stewart II & III*. Moreover, even if the BAP intended to limit "profit

motive" so that it was "not applicable to all situations" (*see id.*), the Bankruptcy Court's test goes

far beyond making sure that "profit motive" is not used in *all* situations. As discussed *supra*, the

Bankruptcy Court's test would seem to limit "profit motive" to almost no situations involving

student debt.[6]

---

[5] In its response brief, for a reason not relied upon by the Bankruptcy Court, the UST argues that
Congress adapted the definition of "consumer debt" from consumer protection laws, and courts have
interpreted that term in certain consumer protection laws to include student loan debt. (ECF No. 17 at 23-
24.) First, the cases upon which the UST relies are from the 1990s, and thus, again, it is hard to say that
Congress in 1978 intended to rely upon those decisions in using the term "consumer debt." Second, as far
as the Court can discern from the UST's argument, it appears that the UST is arguing that, because certain
consumer protection laws classify student loan debt as "consumer debt," such debt should be similarly
classified under the Bankruptcy Code. But, this argument does not give any regard to the Tenth Circuit's
instruction in *Stewart III* that "profit motive" differentiates non-consumer from consumer debt. *Stewart III*,
175 F.3d at 806. If the Tenth Circuit believed that student loan debt should be classified as "consumer
debt" simply because other federal laws have been interpreted in that way, the Tenth Circuit would not need
have gone to the trouble of parsing for what purpose the debtor in that case incurred his student debt. Nor
would the BAP have needed to explain in *Stewart II* that student loan debt is not consumer debt per se, and
the primary purpose of the debt is determinative. *Stewart II*, 215 B.R. at 465.

[6] In that regard, the Court notes the Bankruptcy Court's observation that "[s]ome, but not all,
employers pay the educational expenses of their employees who pursue education in furtherance of a
business requirement." (ECF No. 11-1 at 156 n.11.) Although the number of employers that require an
employee to pursue education and do not pay for it may be open to debate, the Bankruptcy Court effectively

Third, in a similar vein, the Bankruptcy Court found that "profit motive" should be narrowly construed because, without doing so, it would (1) be "problematic" to determine which facts equated to a business investment rather than a personal investment, and (2) allow an exception to swallow the rule. As an initial matter, the "profit motive" principle is not an exception to any rule. Presumably, the "rule" to which the Bankruptcy Court eludes is that consumer debts are incurred primarily for personal, family, or household purposes. As the Tenth Circuit explained, "profit motive" "distinguishe[s]" consumer debt from non-consumer debt. *Stewart III*, 175 F.3d at 806. In other words, debt incurred with a profit motive is not an exception to consumer debt, it is a way of differentiating between consumer and non-consumer debt. Moreover, the Bankruptcy Court's statement presumes that all student loan debt is consumer debt, with only an exception such as a profit motive able to save it from being designated as such. That is not how the § 101(8) analysis works, however, as only the purpose for incurring the debt should cast it in a particular shade.

As for the Bankruptcy Court's statement that factual inquiries would be "problematic," this Court does not see why such inquiries would be any more problematic than in any other context where a court must inquire into the purpose of incurring a debt. To reiterate, *Stewart II* specifically held that "[s]ection 101(8) requires that the court consider the purpose for which the debt was incurred …." *Stewart II*, 215 B.R. at 465. This naturally requires an inspection of the debtor's purpose or intent in incurring the student loan. The fact that this inspection may allow a debtor to recast the original motivation for incurring his or her student debt, which appears to be the Bankruptcy Court's main concern (*see* ECF No. 11-1 at 156), is simply a by-product of inquiring into

---

acknowledges that the second rule in its standard will, in all but some occasions, be rendered meaningless because an employer would have paid the education expenses itself, and thus, the employee would not have incurred any debt related to such expenses.

the debtor's intent in the first place.  Any witness can recast facts or opinions to best fit their current circumstances, but it is the purpose of the adversarial system to illustrate the inconsistencies in a witness' story.  Merely because this may prove difficult, does not mean the process can be swept aside.

Moreover, it is not necessarily a difficult fact gathering process.  For example, if a college student pursues a course of study, say, in business, and then, after graduation, the student decides to become, say, a lifeguard, it would be hardly beyond the realm of difficulty to imagine a fact finder finding that the student did not incur his or her student loan debt with the purpose of obtaining a profit through that education.  If, on the other hand, the same student, after graduation, interviewed for jobs with finance or management departments, but was unable to secure any of the jobs, then it could not be said that the student did not attempt to make good on his or her original profit motive. The important thing to remember in this latter example is that profit *motive* does not mean profit *realized*.[7]  Motive necessarily looks to the reasons behind a course of action, it does not suggest that the course of action need come to fruition.[8]  Thus, provided that a debtor can show that he or she

---

[7] The debtor in *Cherrett* is an example of this.  In that case, the debtor was able to convince a potential employer to provide the debtor, as part of his compensation package, with a loan to purchase a home.  *Cherrett*, 523 B.R. at 663.  According to the debtor, the housing loan was an "integral part" of his decision to accept the employment offer.  *Id*. at 671.  The debtor also stated that he hoped to realize a profit on the resale of any house that he purchased with the loan.  *Id*.  After accepting the employment offer, the debtor purchased a home for $995,000, but, due to the 2008 recession, by the time the debtor filed for bankruptcy, the home was only valued at $420,000.  *Id*. at 664.  In other words, the debtor in *Cherrett* did not realize a profit on his home, he realized a substantial loss.  But, this did not prevent the court from finding that the debtor had a profit motive in purchasing the home.  *Id*. at 672.  In addition, the debtor was obviously not employed by the entity making the employment offer before the debtor accepted it.  Thus, contrary to the Bankruptcy Court's apparent belief (*see* ECF No. 11-1 at 154-155), the facts of *Cherrett* do not stand for the proposition that employment must be current or ongoing at the time the profit motive for debt arises.

[8] In another attempt to analogize the Bankruptcy Code to a different piece of federal legislation (this time, the U.S. Tax Code), the UST argues that, because business expenses under the Tax Code must be carried on 'for profit' in order to be tax deductible, and because educational expenses cannot be deducted as a business expense unless they maintain or improve job skills, educational expenses under the Bankruptcy

took steps to realize the potential of his or her education, there is no reason why such evidence would not show that the debtor had a profit motive in incurring his or her student debt.

It is for this reason that the Bankruptcy Court's fourth "concept," that a debtor's "hope and dream" should not become the focus of the inquiry, is misplaced. As outlined *supra*, it is not necessary to tie "profit motive" to an existing job or employer to avoid focusing upon what the Bankruptcy Court describes as a debtor's hopes and dreams. Such aspirational feelings, although still likely to be expressed, must be supported by some evidence that the aspirant in question attempted, beyond education, to achieve his or her hopes and dreams.

In any event, here, it is not necessary to focus upon Mr. Palmer's hopes and dreams in determining whether he incurred the student loan debt with a profit motive. Notably, it is undisputed that Mr. Palmer was employed throughout the time that he was pursuing his education. In other words, Mr. Palmer was already achieving some of his hopes and dreams. Thus, in terms of steps taken to realize the potential of his education, Mr. Palmer had already taken a great step by being employed. The important question is whether Mr. Palmer's education can be properly characterized as a business investment in himself. *See Stewart II*, 215 B.R. at 465. The Court does not see how it cannot be so characterized.

Code should also be tied to "current employment." (ECF No. 17 at 20-22.) This argument is misplaced. As the UST acknowledges, the part of the Tax Code to which the UST refers addresses the tax deductibility of business expenses if the business activity was "carried on for profit." (*See id.* at 21.) In other words, the taxpayer must be engaged in a business and the expense must have been incurred in carrying on that business. *See* 26 U.S.C. § 162(a). There is simply no such requirement under the Tenth Circuit's "profit motive" standard. If there had been, then the Tenth Circuit could have easily dealt with the classification of the student loan debt in *Stewart III*, as it was undisputed that the debtor was not incurring his student debt in connection with current employment or to carry on a current business. *See Stewart III*, 175 F.3d at 800-801. Simply put, the *business* expense deduction under the Tax Code is obviously looking toward expenses incurred in carrying on a business, otherwise it would not be called a business expense deduction. In contrast, the difference between consumer and non-consumer debt looks to the debtor's *purpose* in incurring the debt, irrespective of whether the debtor is *currently* engaged in a business. *See Stewart II*, 215 B.R. at 465.

At the evidentiary hearing before the Bankruptcy Court, Mr. Palmer testified as follows. EIS is a fee company for insurance companies, performing premium audit and loss control services. (ECF No. 11-2 at 30:17-31:2.)  EIS operates in various States throughout the United States, and some of its customers are owned by foreign entities. (*Id*. at 31:7-13.)  In October 2009, he started a doctorate of business administration at Argosy University, with a concentration in management. (*Id*. at 22:11-13, 25:11-13.)  His employer at the time, EIS, did not require that Mr. Palmer take the doctorate program and EIS did not pay for the program. (*Id*. at 24:6-10.)  Mr. Palmer took the courses at Argosy University online, so that he could continue full-time employment with EIS. (*Id*. at 23:18-21.)  Mr. Palmer's personal goal in taking the doctorate program was to advance his business knowledge and, ultimately, own and run a business. (*Id*. at 23:22-24:2, 33:19-20, 34:6-7.) Specifically, Mr. Palmer wanted to buy and run EIS. (*Id*. at 33:19-34:2.)  Mr. Palmer did not take the doctorate program to begin on a new career path. (*Id*. at 32:24-25.)

As part of Mr. Palmer's doctorate program, he took courses that were connected to EIS' business, and helped improve his knowledge related to that business. (*Id*. at 32:8-12.)  Improving his knowledge in this regard, would help Mr. Palmer make better customer relationships, help Mr. Palmer bring customers to EIS, and help EIS' profitability. (*Id*. at 32:13-17.)  By November 2011, Mr. Palmer had completed his course work for the doctorate program, and from then until November 2014 he worked on a dissertation. (*Id*. at 25:23-26:5.)  Mr. Palmer's dissertation involved a "narrative study" on the Oregon wine industry. (*Id*. at 27:8-10.)  Mr. Palmer did not do his dissertation on the insurance or premium audit industries because he had done a lot of papers for classes on insurance and how the premium audit industry worked, and he wanted to "diversify" his studies. (*Id*. at 41:24-42:8.)  In doing the dissertation, Mr. Palmer talked with winemakers and

researched the wine industry. (*Id*. at 27:4-7.) The topic for the dissertation was supposed to be

related to business and how an industry was being made more profitable. (*Id*. at 37:9-11.) Mr.

Palmer's dissertation on the Oregon wine industry was about management and what the industry had

done to make itself profitable. (*Id*. at 37:12-19.) Mr. Palmer believed the knowledge that he

acquired from doing the dissertation was transferrable to the insurance industry because it showed

how to run a profitable business. (*Id*. at 37:20-38:7.) When Mr. Palmer started his doctorate

program in September 2009, he had just been to Oregon on vacation, and that trip sparked his

interest in the Oregon wine industry. (*Id*. at 26:22:27:3.)

As an initial matter, the Court notes that, other than the records of Mr. Palmer's academic

transcripts, his bankruptcy schedules, and the amount of his student loan debt, the only evidence

before the Bankruptcy Court was Mr. Palmer's testimony. In light of that testimony, Mr. Palmer's

motive for incurring the student loan debt was business or profit related. Notably, Mr. Palmer

testified that he pursued the doctorate program because he wanted to *own* a business. (ECF No. 11-2

at 34:6-7.) Mr. Palmer's testimony could not be more unequivocal on this point. If wanting to own

a business is not profit related, the Court does not know what is, at least where, as here, Mr. Palmer

had an actual business and opportunity in mind: owning EIS. In addition, to the extent owning his

own business was not reason enough, Mr. Palmer further testified that the courses he took helped

him understand how to attract customers to a business, build relationships with them, and,

importantly, run a *profitable* business. (*Id*. at 32:14-17, 38:1-7.) No more was required for Mr.

Palmer to show that the student loan debt was incurred with a profit motive.

The fact that EIS did not require Mr. Palmer to obtain the doctorate degree, or that the degree

did not benefit EIS in some demonstrable way, as discussed *supra*, is irrelevant as to whether *Mr*.

*Palmer* had a profit motive in undertaking the doctorate. That motive is clear from his testimony. To require what the UST seeks would be to turn the profit *motive* test into not only a profit *requirement* test, but an *employer required* profit/benefit test. Because the Tenth Circuit did not go that far in *Stewart III*, neither will this Court.

The Bankruptcy Court also found that Mr. Palmer's testimony "indicated he pursued his doctorate, including his dissertation on the wine industry, at least partially for purposes of pleasure or recreation, in connection with a vacation to the Oregon coast." (ECF No. 11-1 at 157.) This finding was clearly erroneous, as Mr. Palmer's testimony does not indicate, partially or otherwise, that he pursued his doctorate for purposes of pleasure or recreation. As discussed *supra*, Mr. Palmer's testimony was unequivocal: he pursued his doctorate to own a business. Moreover, Mr. Palmer's vacation in Oregon, to the extent relevant, is only relevant to his dissertation; there was no testimony that Mr. Palmer's pursuit of the *doctorate degree* generally was spurred by his trip to Oregon. With respect to the dissertation, Mr. Palmer's testimony is clear that, although he had an interest in wine, his reasons for doing a dissertation on the Oregon wine industry were three-fold: (1) he wanted to diversify his doctorate as he had already written papers on the insurance industry; (2) he wanted to learn how the Oregon wine industry had become profitable, so he could use that knowledge to grow profit at EIS; and (3) the aforementioned interest in wine. The mere fact that Mr. Palmer did his dissertation on a topic of interest should not be disturbing, at least not where as here Mr. Palmer explained the relevance of the topic to his employment.

Finally, the Court brings up one other matter. The burden of proof for a motion to dismiss under§ 707(b) lies with the moving party, here, the UST. *See In re Cherrett*, 523 B.R. at 668. In applying the profit motive test, the Bankruptcy Court required that Mr. Palmer demonstrate that the

student loan debt was primarily incurred for a profit motive. (ECF No. 11-1 at 157.) This seems the correct way to proceed, given that it is the party incurring the debt who will, at least initially, be in the best position to explain why he or she incurred that debt. However, at most, the debtor's burden in this regard is one of persuasion. It still remains the UST's burden to show that the debtor's chapter 7 case should be dismissed, which, means that it remains the UST's burden to show that the debtor's debts are primarily consumer debts. Here, given that the only relevant evidence was Mr. Palmer's own testimony, that evidence was more than enough to satisfy his burden of persuasion in showing that the student loan debt was incurred with a profit motive. Because the UST presented no evidence to contradict Mr. Palmer's testimony of a profit motive, the UST necessarily failed to meet its burden of proof with respect to the motion to dismiss.[9]

---

[9] The Court notes that, in its response brief, the UST raises the specter of a parade of hypothetical horribles befalling the construction of student loan debt under § 101(8) if there is not a requirement that a current employer be benefitted or a current job be advanced. (*See* ECF No. 17 at 29-30.) One of these hypotheticals—differentiating between student debt incurred for tuition and books compared with room and board—assumes that debt used on room and board is not an educational expense for purposes of the profit motive analysis. That is not necessarily an accurate assumption. *See Stewart III*, 175 F.3d at 807. In any event, to the extent that room and board expenses are not deemed incurred with a profit motive, that is simply a natural consequence of requiring that debt be incurred with such a motive; it is not a reason to find *all* student debt to be incurred without such a motive. The UST's next hypothetical involves debtor's with "speculative" hopes of doing something in the future. As the Court discussed *supra*, this problem is sufficiently addressed by requiring a debtor to show that he or she took steps to realize the potential of his or her education. Obviously, a substantial and unexplained gap in time between the end of the debtor's education and an attempt to realize the potential of that education would cut against any finding that the education was incurred with a profit motive. The UST also worries about business tycoon's taking "expensive golf lessons" with the hope of doing deals on a golf course. Putting (no pun intended) aside the philosophical question of whether golf lessons could be classified as educational, and the practical question of whether a person could obtain a student loan to incur golf lesson debt, the Bankruptcy Court's test for profit motive would result in this hypothetical having a profit motive. As noted, under the Bankruptcy Court's test, a tangible benefit to an existing business equals having a profit motive. It is hard to say that a business tycoon, who presumably runs an existing business, does not provide a tangible benefit to that business if he or she brings in a new customer, even a customer obtained during a round of golf.

## IV.     Conclusion

For the reasons set forth herein, the Court REVERSES the decision of the Bankruptcy Court to grant the motion to dismiss, and DENIES the motion to dismiss.  This case is REMANDED to the Bankruptcy Court for further proceedings consistent with this Opinion.


**SO ORDERED.**

DATED this 15th day of November, 2016.


BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge